914 F.2d 1271
 18 Fed.R.Serv.3d 139
 CALIFORNIA UNION INSURANCE CO.; Pacific Employers Insurance
Company, Plaintiffs,
v.
AMERICAN DIVERSIFIED SAVINGS BANK; American Diversified
Company; ADC Financial Corp.; American Diversified
Partners; American Development Corporation; American
Diversified Equity Corporation; Lester G. Day; Mission
National Insurance Company; Federal Insurance Company;
Fireman's Fund Insurance Company; Industrial Indemnity;
American Diversified Investment Corporation, Defendants,
American Diversified Capital Corporation; Federal Savings
and Loan Insurance Corporation, as Conservator for
American Diversified Capital Corporation,
and
Ranbir S. SAHNI, Third-Party Plaintiff-Appellant,
v.
HARBOR INSURANCE COMPANY, Third-Party Defendant-Appellee,
and
National Union Fire Insurance Company of Pittsburgh,
Pennsylvania; Certain Underwriters at Lloyds,
London, Defendants/Cross-Defendants.
 No. 89-55013.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 5, 1990.
Decided Sept. 17, 1990.
 
 Michael G. Dawe, Irvine, Cal., for third-party plaintiff-appellant.
 Michael C. Denison and Charles G. Smith, Kinsella, Boesch, Fujikawa and Towle, Los Angeles, Cal., for third-party defendant-appellee.
 Appeal from the United States District Court for the Central District of California.
 Before HUG, SCHROEDER and HALL, Circuit Judges.
 SCHROEDER, Circuit Judge:
 
 
 1
 This appeal represents a small piece of major ongoing litigation over who should bear losses sustained in the collapse of still another thrift institution insured by the Federal Savings and Loan Insurance Corporation ("FSLIC"). Appellant here is Ranbir S. Sahni, a former director of American Diversified Savings Bank ("ADSB") who is seeking to hold the appellee, Harbor Insurance Company ("Harbor") liable for amounts he may be found to owe to FSLIC, ADSB's receiver.
 
 
 2
 FSLIC is pursuing its claims against Sahni and other directors in related litigation before the same district judge, and although FSLIC did not appeal the district court's section 54(b) ruling in favor of Harbor on Sahni's claim, it was a party in this case at the district court level and joined Sahni in his unsuccessful cross-motion for summary judgment against Harbor.
 
 
 3
 The issue on the merits is whether "claims made" insurance policies issued by Harbor to ADSB covered the claims in question. The two Harbor policies together were in effect from October 1, 1983, to March 1, 1985. Other companies had issued policies covering different periods of time. This case was originally instituted as a declaratory judgment action in state court by one of those insurance companies, California Union Insurance Company, against Sahni and FSLIC and, among other ADSB insurers, Harbor. FSLIC removed the action to federal court pursuant to 12 U.S.C. Sec. 1730(k)(1), which establishes federal question jurisdiction for a "civil action, suit or proceeding to which [FSLIC] shall be a party," with provisos not here relevant.
 
 JURISDICTION
 
 4
 We address a preliminary jurisdictional question. At the time of removal, the plaintiff in the declaratory judgment action had dismissed Harbor from the case because the plaintiff had concluded that Harbor's insurance policies did not cover the claims in question. Sahni and FSLIC disagreed, however, and after removal, Sahni filed a "third-party complaint" against Harbor in order to bring it back into the case. FSLIC joined Sahni's cross motion for summary judgment against Harbor, the denial of which Sahni now appeals.
 
 
 5
 In response to our request for briefs on jurisdiction, the appellant Sahni now contends that the Supreme Court's recent decision in Finley v. United States, 490 U.S. 545, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989), requires us to hold that the district court lacked jurisdiction over Sahni's claim against Harbor.
 
 
 6
 The Supreme Court in Finley held that the grant of federal jurisdiction in the Federal Tort Claims Act ("FTCA") of claims against the United States was not broad enough to reach a complaint against other defendants. The grant of jurisdiction in 12 U.S.C. Sec. 1730(k)(1),[1] however, is far broader than the grant of jurisdiction for a claim against the United States under the FTCA. The FSLIC statute establishes federal jurisdiction over any proceeding to which FSLIC is a party. Assuming arguendo there may be cases in which FSLIC's presence as a named party may be insufficient to confer federal court jurisdiction over a controversy unrelated to FSLIC, FSLIC in this case was not merely a nominal party to the declaratory judgment action from which this appeal arises. FSLIC also has a clear stake in Sahni's claim against Harbor, since Sahni's aim is to make Harbor responsible for satisfying FSLIC's claims against Sahni. FSLIC's interest is demonstrated by the fact that FSLIC joined Sahni in his motion for summary judgment.
 
 
 7
 Unlike the grant of jurisdiction under the FTCA, section 1730(k)(1) is not limited to claims against the United States. The grant of jurisdiction in section 1730(k)(1) is broad enough to authorize the district court to exercise its discretion pursuant to the Federal Rules to permit this claim to be considered in the context of a declaratory judgment action designed to determine issues of insurance coverage. See Fed.R.Civ.Proc. 14, 20. The court properly found Harbor's joinder appropriate, over no objection. It did so, agreeing that Sahni's claims against Harbor were "so closely related to the main claim that for reasons of justice in order to avoid piecemeal the litigation claims should be heard together." The conclusion is in harmony with the purpose of section 1730(k)(1) which is intended to permit federal courts to deal with all proceedings in which FSLIC, when it is acting as an agency of the United States, is a party. See Federal Savings and Loan Ins. Corp. v. Ticktin, 490 U.S. 82, 109 S.Ct. 1626, 104 L.Ed.2d 73 (1989). The statute is intended to permit resolution of competing claims in a single federal forum. The narrow interpretation now proffered by appellant would make that impossible.
 
 
 8
 We therefore turn to the merits of the appeal.
 
 The Policies
 
 9
 Each of the Harbor policies were "claims made" policies. In relevant part each of them provided that Harbor shall pay on behalf of the insured "loss ... arising from any claim or claims made against the insureds ... during the policy period by reason of any wrongful act...." The term "loss" is defined as "any amount an insured is obligated to pay in respect of this legal liability whether actual or asserted, for a wrongful act...." This amount includes "damages, judgments, settlements and costs, charges and expenses incurred in the defense of actions, suits or proceedings and appeals therefrom...." "Wrongful act" is defined as:
 
 
 10
 Any breach of duty, neglect, error, misstatement, misleading statement, omission or other act done or wrongfully attempted by the insureds or any of the foregoing so alleged by any claimant or any matter claimed against them solely by reason of their being such directors or officers of the corporation.
 
 
 11
 The policies provided coverage for claims made during the policy period and after the policy period ended, so long as the notice of the potential claim was given to Harbor within the policy period.
 
 
 12
 The "policy period" began October 1, 1983, and ended March 1, 1985. This dispute arises because FSLIC's lawsuit against Sahni, setting forth the claims he now asserts are covered by Harbor, was not filed until 1986. The issues in this dispute which we must resolve thus concern whether communications between various parties during the policy period amounted to "claims made." We must also determine whether there should have been further discovery or other proceedings to permit appellant to show there was sufficient notice within the policy period of a potential claim within the meaning of the policy provisions.
 
 Background
 
 13
 On March 26, 1984, ADSB received from the Federal Home Loan Bank Board ("FHLBB") a letter informing the Bank that it had not been timely in filing its monthly financial reports; fault had been found with ADSB's accounting system; and, the FHLBB did not have full confidence in the integrity of ADSB's records. The letter requested that ADSB take immediate action to remedy the situation.
 
 
 14
 On or about April 6, 1984, the California Department of Savings and Loan ("CDSL") issued a Cease and Desist Order prohibiting ADSB from investing in or transferring to its service corporations any of the assets of ADSB until an investigation had been completed. This order was a result of ADSB's accounting procedures.
 
 
 15
 In June of 1984, Sahni was advised by FSLIC and CDSL that ADSB was guilty of specified statutory and regulatory violations and that FSLIC intended to initiate formal regulatory enforcement proceedings unless the Board of Directors of ADSB consented to enter into a supervisory agreement with FSLIC and CDSL. That same month, on June 20, ADSB entered into a Supervisory Agreement with FSLIC. Under this Agreement the FSLIC agreed to forbear instituting formal cease-and-desist proceedings. In exchange, ADSB agreed to dispose of noncomplying loans, provide an accurate accounting, and otherwise bring itself into compliance with applicable regulations.
 
 
 16
 On July 6, 1984, CDSL ordered a special examination of ADSB under California's Financial Code Sec. 8154(a). This examination required ADSB to pay the expense of bringing in independent auditors to complete the investigation. CDSL also claimed that ADSB had still failed to comply with the terms of the Supervisory Agreement of June 20, 1984.
 
 
 17
 In September, 1984, FHLBB requested information from ADSB on contingency plans in the event that ADSB sustained any sudden unplanned withdrawal of deposits.
 
 
 18
 On October 6, 1984, which was still within the period covered by a Harbor policy, CDSL rescinded its cease-and-desist order, subject to ADSB's acceptance of three conditions:
 
 
 19
 (1) ADSB was to maintain a net worth of at least five percent of its total assets;
 
 
 20
 (2) ADSB's aggregate investment in its service corporations was not to exceed sixty percent of ADSB's total assets until further order of the Commissioner; and
 
 
 21
 (3) ADSB was to take "necessary corrective action" as recommended by its statutory auditors in the report of Management Audit.
 
 
 22
 Finally, on February 14, 1986, after the Harbor policy period had ended, the FHLBB determined that ADSB was insolvent, appointed the FSLIC as the conservator, and the FSLIC filed suit against Sahni and others for alleged breaches of duty committed while directors of ADSB. The lawsuit against Sahni alleged that he individually breached his fiduciary duty of due care to ADSB by failing to maintain accurate and adequate records of transactions and he maintained a conflict of interest with ADSB's subsidiaries and other companies owned or controlled by him.
 
 
 23
 On April 23, 1986, Sahni's counsel requested coverage by Harbor under the policies. On April 29, 1986, Harbor denied any coverage obligation based on the fact that the FSLIC lawsuit was filed after the expiration of the policies.Were Any Claims Made?
 
 
 24
 Although an actual lawsuit against Sahni was not filed until February 19, 1986, Sahni argues that letters from the FHLBB detailing ADSB's deficiencies and requesting immediate action by the directors of ADSB were actually "claims made" within the meaning of the insurance policies. We disagree.
 
 
 25
 We review a grant of summary judgment de novo. Kruso v. International Telephone & Telegraph Corp., 872 F.2d 1416, 1421 (9th Cir.1989). The parties agree that California law applies to the interpretation of the Harbor policies. We are bound to follow an interpretation by the California Supreme Court of California law. See, e.g., West v. American Telephone & Telegraph Co., 311 U.S. 223, 236, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940).
 
 
 26
 Sahni's first contention is that "claims-made" policies are ambiguous and therefore "coverage must be found if it is available under any reasonable interpretation of the policy." California courts, however, have never found claims-made policy provisions to be ambiguous. The rulings are to the contrary. See, e.g., Gyler v. Mission Ins. Co., 10 Cal.3d 216, 219-20, 514 P.2d 1219, 1221, 110 Cal.Rptr. 139, 141 (1973) (noting that the phrase "claims made" is not ambiguous); Phoenix Ins. Co. v. Sukut Const. Co., Inc., 136 Cal.App.3d 673, 677, 186 Cal.Rptr. 513, 515 (1982) ("a claim ... is a demand for something as a right, or as due."); Williamson & Vollmer Engineering v. Sequoia Ins. Co., 64 Cal.App.3d 261, 269-70, 134 Cal.Rptr. 427, 431 (1976) ("the term imports the assertion, demand or challenge of something as a right; the assertion of a liability to the party making it to do some service or pay a sum of money ... a 'claim' refers to a debt due the claimant. It is a money demand.") (citations omitted); San Pedro Properties, Inc. v. Sayre & Toso, Inc., 203 Cal.App.2d 750, 21 Cal.Rptr. 844 (1962); see also Hoyt v. St. Paul Fire & Marine Ins. Co., 607 F.2d 864, 867 (9th Cir.1979) ("the 'claim' contemplated is unambiguously in the nature of a demand or notice"). Thus, California courts would not hold that a claims-made policy is inherently ambiguous, but rather that the term must be interpreted as any other contract term. See Producers Dairy Delivery Co. v. Sentry Ins. Co., 41 Cal.3d 903, 912, 718 P.2d 920, 928, 226 Cal.Rptr. 558, 566 (1986); Hallmark Ins. Co. v. Superior Court, 201 Cal.App.3d 1014, 1019-20, 247 Cal.Rptr. 638, 643-44 (1988); Employers Reinsurance v. Phoenix Ins. Co., 186 Cal.App.3d 545, 555, 230 Cal.Rptr. 792, 802 (1986).
 
 
 27
 Notwithstanding the unambiguous nature of the policy, Sahni asserts that the various letters from the FHLBB and CDSL constituted "claims made" under the policy. None of the communications to Sahni or ADSB during the policy periods amounted to any assertion of liability on their part for any conduct under investigation.
 
 
 28
 The CDSL management order of July 6, 1984, and the two letters of April 6 and October 6, 1984 pertaining to CDSL's cease-and-desist orders do not assert claims because they neither threatened formal proceedings against Sahni as a consequence of failure to comply nor propose to hold the officers and directors personally liable for the deficiencies. CDSL's cease-and-desist order did not state any formal consequences for ADSB's failure to comply with the order. Similarly, CDSL's order requiring ADSB to submit to a management audit stated that the audit's purpose was to aid ADSB's compliance with the necessary regulations, and did not threaten any formal consequences for failure to comply. Finally, although the FSLIC agreement stated that the Board had agreed to take certain actions in return for FSLIC's "forbearance" from formal cease-and-desist proceedings against the institution, no formal action was threatened against the officers or directors as a consequence of breaching the agreement.
 
 
 29
 We considered a similar factual situation in a case construing Arizona law. In Hoyt v. St. Paul Fire & Marine Ins. Co., 607 F.2d 864 (9th Cir.1979), a letter was sent to the insured, an attorney, accusing him of gross negligence in preparing a will and demanding from him "all sums paid or which may hereafter become due or payable by the estate." Subsequent to receiving the letter, but after the malpractice insurance policy expired, suit was brought by the estate against the attorney. This court held that the policy did not provide coverage:
 
 
 30
 [i]n our judgment the letter of April 5, 1974 did not constitute a claim. It was a request for information and explanation. If Hoyt was put on notice of any kind it was only that a claim might be expected to follow if the estate attorney was not satisfied with the explanation. In our view an inquiry cannot be transformed into a claim or demand depending in each case on the reasonable expectations of the insured--whether he should reasonably have been satisfied that the explanation would be accepted as justification for the questioned conduct or should reasonably have expected that it would not. Such a rule would firmly write uncertainty of coverage into every policy.
 
 
 31
 Id. at 866 (emphasis added). Hoyt was favorably cited in Employers Reinsurance, 186 Cal.App.3d at 555, 230 Cal.Rptr. 792 (1986), where the California court held that a complaint and summons were claims. Id.
 
 
 32
 There are conflicting district court decisions applying California law, however. Compare Burns v. International Insurance Co., 709 F.Supp. 187 (N.D.Cal.1989), with Mt. Hawley v. Federal Savings & Loan Insurance Corp., 695 F.Supp. 469 (C.D.Cal.1987). The district court in Burns held that a FSLIC investigation and Supervisory Agreement did not, by themselves, give rise to a claim, but were occurrences "that might subsequently give rise to a claim." Id. at 189. The rationale of Burns is persuasive. The term "claim" should not be interpreted so broadly as to include a regulatory agency's request of the insured to comply with regulations where, as here, the agency did not directly threaten ADSB with liability, it made no "money demand," Williamson, 64 Cal.App.3d at 269-70, 134 Cal.Rptr. 427, or "demand or challenge [ ] something as of right." Id.; Phoenix Ins., 136 Cal.App.3d at 677, 186 Cal.Rptr. 513; see also MGIC Indem. Corp. v. Home State Sav. Ass'n, 797 F.2d 285, 288 (6th Cir.1986) (assertion that a "wrongful act" has occurred is "not the same thing as a claim for payment on account of a wrongful act"; a claim for payment is required to invoke coverage). Under California law, no "claim" was made. See Gyler; Williamson & Vollmer Engineering.
 
 
 33
 Was There a Viable Contention that Harbor had Notice of a Potential Claim?
 
 
 34
 Subsection 7(C)II[2] of the policies allows in effect coverage for claims made after the policy period if notice of a potential claim is given to Harbor within the policy period. Sahni argues that the district court erred in concluding that Sahni had not established a genuine issue of material fact as to whether Harbor had received notice. Sahni also argues that the district court erred in refusing additional discovery under Federal Rule of Civil Procedure 56(f) to depose Harbor regarding its "actual knowledge" of these potential claims. We reject these contentions.
 
 
 35
 The first issue Sahni raises is whether Harbor received timely notice of the regulatory activity which would trigger the policies' "potential claims" protection. Sahni acknowledges that the insureds had not personally given Harbor notice. He argues that we should hold Harbor nevertheless had sufficient constructive notice because, according to Sahni, Harbor had documents which should have alerted it to the existence of a potential claim.
 
 
 36
 We decline Sahni's invitation to adopt a "constructive notice" theory in this case. First, the principal documents relied upon would not have alerted Harbor to anything Sahni considered to be a potential claim. Sahni relies on a letter to ADSB from ADSB's insurance broker, James Econn & Co., for the assertion that Harbor may have received notice of the regulatory actions by way of some source other than ADSB itself. The letter merely asserts that certain aspects of ADSB's financial condition were making it difficult for the broker to obtain adequate insurance for the S & L. Sahni also claims that "[d]ocumentation such as annual reports, interim reports, 10k reports, proxy materials, and other documentation relating to ADSB's net worth and its level of brokered deposits" would have alerted Harbor to ADSB's regulatory problems. There is no assertion that this information included any reference to the regulatory agencies' investigations. In addition, the policies specifically required the insureds to notify Harbor of potential claims. Sahni did not allege before the district court that he or any other insured provided any information to Harbor that would alert the insurance company as to a "potential claim." Sahni's reliance on Local 38 v. Aetna Cas. & Sur. Co., 790 F.2d 1428 (9th Cir.1986), amended, 811 F.2d 500 (1987), is therefore misplaced. In Local 38, the insured provided its insurer with a Department of Labor 5500 form and an audit of the insured. These reports showed "that the Department of Labor had been auditing the trust fund since 1971." Id. at 1429. We held the material contained in the reports to be sufficient to bring to a jury the question of whether the information constituted "notice" to the insurer. Here there was no similar information provided by the insured to the insurer suggesting a potential claim.
 
 
 37
 Thus, the district court did not err by finding that Sahni failed to meet his burden of establishing a genuine issue of material fact as to whether Harbor had actual notice of "potential claims" against Sahni. See Burns, 709 F.Supp. at 191 (denying coverage because insured parties failed to notify insurer of potential claims based on the regulatory activity until several months after the policy term had ended); see also Tzung v. State Farm Fire and Cas. Co., 873 F.2d 1338, 1342 (9th Cir.1989) (summary judgment proper where no coverage as a matter of law under insurance policy); Hallmark, 201 Cal.App.3d at 1020, 247 Cal.Rptr. 638 (same).
 
 
 38
 There is one remaining contention. Sahni argues that the district court abused its discretion by refusing to allow him additional time to depose Harbor before deciding the motion for summary judgment.
 
 
 39
 The district court has discretion to continue a motion for summary judgment if the opposing party needs to discover essential facts. Fed.R.Civ.P. 56(f); Garrett v. City and County of San Francisco, 818 F.2d 1515, 1518 (9th Cir.1987). The district court does not abuse its discretion by denying further discovery if the movant has failed diligently to pursue discovery in the past, Mackey v. Pioneer National Bank, 867 F.2d 520 (9th Cir.1989), or if the movant fails to show how the information sought would preclude summary judgment. Hall v. State of Hawaii, 791 F.2d 759, 761 (9th Cir.1986).
 
 
 40
 Here, Sahni sought to continue the summary judgment disposition long enough to depose a Harbor representative on the question of whether Harbor had had "actual knowledge" of claims made against Sahni. However, no actual "claims" were made during the policy period as a matter of law. The deposition could not have produced any new information material to the issue of whether Harbor had notice of "claims made" during the policy periods.
 
 
 41
 Sahni also asserts that the deposition could have produced information showing that Harbor had "actual knowledge" of "potential claims" during the policy period. Again, since all written communications to Harbor had already been produced, and these did not indicate that Harbor had received any notice of potential claims, there was no likelihood of material new information being disclosed at the deposition.
 
 
 42
 Therefore, Sahni failed to assert any basis on which the district court should have granted his Rule 56(f) request, and the district court did not abuse its discretion by denying it. See Mackey, 867 F.2d at 524; Hall, 791 F.2d at 761.
 
 
 43
 AFFIRMED.
 
 
 
 [1]
 This subsection provides
 (k) Jurisdiction and enforcement
 (1) Notwithstanding any other provision of law, (A) the Corporation shall be deemed to be an agency of the United States within the meaning of section 451 of Title 28; (B) any civil action, suit, or proceeding to which the Corporation shall be a party shall be deemed to arise under the laws of the United States, and the United States district courts shall have original jurisdiction thereof, without regard to the amount in controversy; and (C) the Corporation may, without bond or security, remove any such action, suit, or proceeding from a State court to the United States district court for the district and division embracing the place where the same is pending by following any procedure for removal now or hereafter in effect: Provided, That any action, suit, or proceeding to which the Corporation is a party in its capacity as conservator, receiver, or other legal custodian of an insured State chartered institution and which involves only the rights or obligations of investors, creditors, stockholders, and such institution under State law shall not be deemed to arise under the laws of the United States. No attachment or execution shall be issued against the Corporation or its property before final judgment in any action, suit, or proceeding in any court of any State or of the United States or any territory, or any other court.
 12 U.S.C. Sec. 1730(k)(1).
 
 
 [2]
 This section provides:
 (C) If during the policy period:
 (I) The corporation or the insureds shall receive written or oral notice from any party that it is the intention of such party to hold the insureds responsible for the results of any specified wrongful act by the insureds while acting in the capacities aforementioned; or
 (II) The corporation or the insureds shall become aware of any occurrence which may subsequently give rise to a claim being made against the insureds in respect of any such wrongful act;
 and shall in either case during such period give written notice to the company of the receipt of such written or oral notice under (I) above or of such occurrence under (II) above, then any claim which may subsequently be made against the insureds arising out of such wrongful act shall for the purpose of this policy be treated as a claim made within the period of this policy. (emphasis added).